UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED IN CLERKS OFFICE 2013 DEC 24 P 12: 18 U.S. DISTRICT COURT DISTRICT OF MASS.

**PATRICK MICHAUD,**
***Plaintiff,***

vs.

**LAWRENCE A. CALDRONE,**
**KENNETH KELLY,**
**JEFFREY FIRNSTEIN, AND**
**ROBERT SHEETS,**
***Defendants***

CIVIL ACTION NO.:12-CV-10540-WGY

**PLAINTIFF'S MOTION TO TERMINATE ATTORNEY MAX VOLTERRA, STRIKE CERTAIN "UNDISPUTED FACTS" FROM THE PRE-TRIAL MEMORANDUM, AND FOR THIS COURT TO FIND THE OFFICERS DID NOT HAVE PROBABLE CAUSE TO ARREST THE PLAINTIFF – UNDER ANY SCENARIO**

NOW COMES the Plaintiff and terminates Attorney Max Volterra from representation of the Plaintiff in the above-captioned matter. The Plaintiff also requests that certain "undisputed facts" contained in the pre-trial memorandum filed against the Plaintiff's wishes be stricken. Finally, the Plaintiff respectfully requests this court find as a matter of law that the Defendant police officers did not have probable cause to arrest the Plaintiff under any scenario based upon the facts of this case, including the Defendants' proposed facts.

In support of Plaintiff's motion, the Plaintiff states as follows:

On Tuesday, December 17, 2013, Plaintiff repeatedly requested that Attorney Max Volterra remove many sections from the undisputed facts section of paragraph two of the pre-trial memorandum. The reason for Plaintiff's request was that these "undisputed facts" were, in fact, disputed and, more importantly, the Plaintiff's

contentions were supported by the evidence. Despite Plaintiff's requests to remove these disputed facts, Attorney Volterra refused to remove these paragraph two sections and instructed his secretary to file the pre-trial memorandum with the above-referenced included language "undisputed facts".[1] In addition, even after Attorney Volterra filed the Pre-Trial Memorandum with the disputed facts against the Plaintiff's explicit protestations and repeatedly respectfully requested that Attorney Volterra amend the Pre-Trial Memorandum by removing these facts in dispute and file with the court, Attorney Volterra ignored the Plaintiff's requests.

The "undisputed facts" paragraph sections were and are disputed for the following reasons:

**Paragraph 2(d)**: Benzan supposedly recounted the story to the officers, including Officer Calderone and Lt. Sheets:

First, in paragraph 2(d), the Defendants attempt to deceive this court by asserting that Benzan told the officers that he worked for "Pat" Michaud and that the Plaintiff pulled a gun on him. Contrary to this false assertion by the Defendants, Boston Police Officer Erica Bradley testified under oath at her deposition on several occasions that Benzan *did not* know the Plaintiff's last name. (See Officer Bradley Transcript attached as Exhibit A at 10:16; 13:15-16; 18:17-18.) In addition, Officer Calderone recited in his police report that Benzan had made a claim that a man named "Pat" had assaulted him

[1] This is not the first time Attorney Volterra has deliberately ignored and disregarded the Plaintiff's valid and reasonable requests. (1) Previously, the Plaintiff had requested on more than one occasion that Attorney Volterra request a substitute for Officer Kenneth Kelly who died in March of 2013. Attorney Volterra repeatedly ignored this request. (2) On the same day that Attorney Volterra refused to remove the facts in dispute, Attorney Volterra notified that Plaintiff that he would not confer with the Defendants' attorney regarding non-responsive discovery despite Attorney Volterra's acknowledgement with Plaintiff that the Defendants failed to properly respond to discovery requests. Attorney Volterra had numerous e-mails to Defendants' counsel to confer, but now refuses to seek valuable discovery. (3) This most recent deliberate action by Attorney Volterra (the "undisputed facts"), however, impacts the heart of the Plaintiff's case and could potentially be fatal to it. For these reasons, the Plaintiff is compelled to file this motion.)

and that when Officer Calderone confronted the Plaintiff, he asked him if he was "Pat" – not are you "Pat Michaud"? (See Police Report attached hereto as Ex. B; see also Officer Calderone Interrogatories #7 & 9 attached hereto as Ex. C). This fact is critical for this court in determining what deference or credibility it should give to the officers involved in the case should the court look to any other representations or documents other than the police report to determine whether there was probable cause to arrest. If Officer Calderone truly had known the Plaintiff's last name, presumably he would have asked "Are you Pat Michaud?"

Notwithstanding both the police report reference to the name "Pat" only and Officer Bradley's testimony that Benzan only knew the Plaintiff's first name despite the fact that Benzan received several checks from the Plaintiff over the course of several years (See attached hereto Ex. D for a copy of checks written to Benzan and a file folder with the Plaintiff's name written by Benzan), Officer Calderone changed his story and testified at his deposition that Benzan knew the Plaintiff's last name. Officer Calderone testified that Benzan said that "Pat Michaud" had assaulted him. (See Officer Calderone's Transcript attached hereto as Ex. E at 17:1-8; 18:13-21; 25:19-22.)

This change in testimony is troubling for many reasons. For one, the police report recites that Benzan claimed a guy named "Pat" assaulted him. Officer Calderone uses only the name "Pat", but now, suddenly, in an attempt to have a more "identifiable" suspect, Officer Calderone uses the Plaintiff's full name – "Patrick Michaud". Further, the Defendants now claim that Benzan gave a complete description of the Plaintiff prior to leaving the station. Nowhere in the police report does Officer Calderone make reference to Benzan providing a complete description of the Plaintiff. (See Police Report

attached hereto as Ex. B.) Plus, Officer Calderone has produced no notes to that affect. Moreover, and more alarming, is the fact that Assistant District Attorney Pagliarulo told Plaintiff's criminal attorney, Todd Bennett, that he spoke with Officer Calderone immediately before he nol prossed the criminal charges against the Plaintiff. In relaying this conversation to Attorney Bennett, ADA Pagliarulo told Attorney Bennett that Officer Calderone told him that he never spoke with the alleged victim. ADA Pagliarulo also told Attorney Bennett that a Detective Wightman interviewed Benzan and never believed him. (See Attorney Bennett affidavit and e-mails attached hereto as Ex. F.) Yet, in Officer Calderone's response to Interrogatory #9 (See Ex. C), he asserts that he approached the Plaintiff "fitting the complete description of the suspect". However, nowhere is there any mention to a description of the Plaintiff in the police report. Furthermore, in the 4th paragraph of the same response to the interrogatory and begins with the words "In my experience . . .", Officer Calderone recites his basis for finding Benzan a credible complainant. Nowhere in that paragraph is there any reference of the Plaintiff's description. Moreover, Officer Calderone took no notes of his supposed interview with Benzan and now suddenly, four years later, has a vivid memory of additional statements by Benzan.

In addition, Lt. Sheets testified that he does not recall whether he spoke to Benzan, but he only sent the officers to investigate – not arrest the Plaintiff. (See Lt. Sheets Transcript attached hereto as Ex. G. at 11:8-10; 12:1-3; 13:24; 14:1-5; 19:10-15; 19:21-23). The only logical conclusion a prudent police officer could gather from Lt. Sheets' order is that he had some question as to the credibility of Benzan's story, but wanted the matter to be investigated further because the allegations involved a gun. In

another, yet unrelated but similar case, Lt. Sheets and Detective Wightman investigated a claim of a gun but found the claim unsubstantiated. (See attached hereto Police Report dated April 2009 as Ex. H.) It is clear that the officers did not exercise the same type of analysis or reasonableness in the Plaintiff's case and leads one to believe there were other motives on the part of the police to arrest the Plaintiff where there was no probable cause to arrest. (See Patrick Michaud Affidavit attached hereto as Ex. I - Officer Calderone threatened Michaud that "he should know better than to not cooperate with the Boston Police".)

The Defendants also assert that Benzan claimed he was illegal, wanted by the police, worked "under the table", etc, yet none of this is included in the police report and the Defendants have no notes or other documentation to support these contentions. Despite these suspicious assertions by the police, in fact, Benzan was not illegal, was paid by check by the Plaintiff, and lived in New York – not a homeless shelter. He was also arrested by the Boston Police for assault and battery on a police officer. (See Immigration Board of Appeals Decision dated April 16, 2009 page two, paragraph one attached hereto as Ex. J.) See also paragraph 2(e) below for additional supporting argument.

**Paragraph 2(e)**: The suspect described the gun in detail as a long barreled black revolver.

Although the plaintiff does not have concrete evidence of whether Benzan described a gun in detail, this court should look at the averments by the Defendants with caution. Not only have the officers provided inconsistent and contradictory testimony as

discussed previously and below, but also, Officer Calderone was not believed in another eerily similar case involving another dispute over $500 (the exact amount of money in this case supposedly) and an alleged victim that could not be located after the alleged incident. See U.S. v. Hughes, 95 F.Supp 2d 49 (2000). It is important to note that United States District Court Judge Keeton found Officer Calderone's testimony not credible and that Officer Calderone was placed on notice (as if he shouldn't have already known) that you must include all pertinent evidence into the police report – especially exculpatory evidence.

In addition, Officer Calderone blatantly lied at his deposition when he was asked about his involvement in two other incidents where he violated person's civil right – Tina Boe (a/k/a Tina Boe in Commonwealth v. Boe, 456 Mass. 337 (2010)) and Stephen Walsh. When Calderone was asked about the Commonwealth v. Tina Boe case, he testified that it wasn't him despite the Honorable Judge Kathleen Coffee's decision which cites Officer Lawrence Calderone as the officer who caused Ms. Boe to have a permanent criminal record without any probable cause. (See Officer Calderone Transcript Ex. at 60:16-24 & 61 & 62:1-3.; see also attached hereto Judge Coffee's decision as Ex. P.) When Calderone was asked about an incident in which he threatened a photographer named Steven Walsh, he denied any involvement in this incident as well. (See Calderone Ex. 64:4-15; See also Stephen Walsh Transcript attached hereto as Ex. O at 6:21-24; 7-5-7; 8:10-24; 9:1-24; 10:1-14;

In this case, the police claim Benzan was homeless when in fact he lived in New York. They did not get Benzan's social despite the fact that he had been arrested by the Boston Police previously and they claim they did no investigation into his statements,

including that he was illegal and wanted by the law. (See Immigration records attached as Exhibit J; See also, B.C.R. Transportation Company, Inc. v. Fontaine, 727 F.2d 7, 10 (1st Cir. 1984)). Moreover, Detective Wightman never believed Benzan's story that someone pulled a gun on him.

**Paragraph 2(f)** – The suspect agreed to remain at the station while Officers Calderone and Hawkins investigated further.

Although the plaintiff does not have concrete evidence of whether Benzan agreed to stay at the station or not, the representations by the Defendants should not be held credible for three reasons: (1) nothing in the report mentions anything about Benzan agreeing to stay at the station and the defendants have no notes or other documents supporting this assertion, (2) Benzan was wanted by the law according to the Defendants so presumably he would not be allowed to leave pursuant to Boston Police Rules & Regulations (See Rules & Regulations Rule attached hereto as Ex. and Boston Globe Article attached hereto as Ex. L.), and (3) Officer Calderone's testimony at deposition reveals that he is lying about not only what the Plaintiff was alleged to have done, but also, the other officers' involvement in the case (See discussion of Officer Calderone, Officer Hawkins, and John Higgins testimony below). Therefore, it is just as probable and more likely that Benzan was told to stay at the station and that he wasn't free to leave.

**Paragraph 2(g)** – Officer Calderone went to the house and observed the truck matching Benzan's description.

There are several problems with this proposed issue of undisputed fact. First, pursuant to the police report, Benzan gave a description of a gray pick-up truck. There was no further description of the vehicle. This may be a minor subtlety, but coupled with the rest of the Defendant officers' inconsistent testimony, it is worth noting. Second, Officer Calderone never spoke to Benzan according to ADA Pagliarulo. (See Affidavit of Attorney Bennett Ex. F.) Third, according to the officers, Benzan did not know the Plaintiff's last name so when they approached the Plaintiff and simply arrested him without any corroboration they failed to investigate the claims. Also, it is very important to note that the truck located at the arrest scene was not in the Plaintiff's name – it was in his father's name - who has a different first name than the plaintiff. These coupled with the contradictory testimony and lies by the officers involved at the arrest scene as will be outlined below draw into question the credibility of the officers and what Benzan actually told the police.

**Paragraph 2(h)** – Officer Calderone relayed the information given by Benzan to the other Officers who arrived at the scene.

Officer Calderone claims to have provided Officers Kelly and Firnstein with information about the Plaintiff and the alleged assault with a gun given by Benzan. However, as previously stated, Officer Calderone told ADA Pagliarulo that he never spoke with Benzan. Furthermore, Officer Firnstein testified at his deposition that he was told about Benzan's story at the station - not at the arrest scene by Officer Calderone.

**Paragraph 2(i)** – As the officers approached the house on foot, the suspect/plaintiff emerged from the house.

As outlined above, Benzan never provided the police with a description of the Plaintiff. There was no mention of the Plaintiff's description in the police report and the police "investigated" (this term is used loosely because the police did not investigate the claims) Benzan's claims relying upon a guy named "Pat" who had driven a gray pick-up truck. For this reason alone, the term "suspect" is disputed by the Plaintiff.

**Paragraph 2(j)** - No CORI search was accomplished for either Benzan or the Plaintiff prior to the police arresting the Plaintiff.

This assertion by the Defendants is in dispute for the following reasons: (1) Sgt. Perez told Attorney Bennett at the police station shortly after the arrest that Benzan had a long criminal record and that the Plaintiff did not possess an FID card (See Ex. F), (2) Detective Wightman told ADA Pagliarulo that he did not believe Benzan (presumably Det. Wightman pulled Benzan's CORI) (See Ex. F.), (3) it would seem logical if the officers knew the Plaintiff's full name that they would perform a CORI and FID check despite the fact that the Defendants have continually rejected the assertions by the Plaintiff that they did, in fact, pull his CORI and FID status, and (4) the Plaintiff is still awaiting the results from the Motion to Compel the CORI Inquires from DCJIS to establish whether the police did make inquiries into Benzan and the Plaintiff's CORi and FID card status. It is anticipated that this evidence will further reveal the Defendants' misrepresentations to this court.

**Paragraph 2(k)** – No search was done prior to arrest to see if the Plaintiff had any gun permits.

The Plaintiff respectfully refers this court to the preceding paragraphs and argument. In addition, this assertion again makes no logical sense. If it is to be presumed that the Plaintiff did in fact possess a black long barreled handgun, this should give the prudent officer caution and make him do a CORI and FID card status search. To do otherwise, in the case of serious gun allegations, would be not only negligent should the suspect have an arsenal of weapons thereby jeopardizing the safety of the officers, but more importantly, this would be unreasonable given the fact that the police did not get dispatched to arrest the Plaintiff for at least 30 minutes after Officer Bradley called the Plaintiff at 11:12 a.m. to inquire of Benzan's allegations. (See Dispatch Report attached hereto as Ex. M. and Plaintiff's telephone records showing 11:12 call attached hereto as Ex. N.) Certainly, a half an hour was more than enough time to perform this rudimentary investigation. Finally, the Plaintiff is still awaiting discovery from DCJIS to determine when, in fact, the officers checked his CORI and FID card status.

**Paragraph 2(l)** – Officer Bradley called Michaud to inquire about Benzan's claims.

Although the Plaintiff does not disagree that Officer Bradley did call him, based upon the inconsistencies in the officers' testimony and the fact that "testilying" (a term used by former Boston Police Commissioner Edward F. Davis to describe the apparent rampant lying under oath by Boston Police Officers) has been a problem in the department, this court should have serious doubts about these officers' testimony given

the ample contradictory evidence on the record. Moreover, if Officer Bradley truly believed Benzan's story and the police did not perform a CORI or FID card status on the Plaintiff, why in the world would she ever call the Plaintiff to tip him off that they received a complaint about a gun? This would not only be unreasonable and imprudent police behavior, it would be reckless behavior on the part of the police when public citizens' safety were at stake. What if the Plaintiff did have an FID card, an arsenal of weapons, and a lengthy CORI? The consequences are grave. It is unfathomable to think that any police officer would find the actions by the Boston Police in this case – i.e. supposedly, not pulling a CORI or FID card status query – as reasonable. For these reasons, the only logical conclusion is that they did not believe Benzan and that is why they called the Plaintiff – to find out if there was any credence to Benzan's story.

**Paragraph 2(n)** - Officer Hawkins and Calderone went to the house and radioed for back-up once they confirmed the description of the house and the vehicle.

The Plaintiff respectfully refers this court to the previously outlined facts and argument. Moreover, incredibly telling that Officer Calderone is lying about his interactions with the Plaintiff and his supposed communications with Benzan, Officer Calderone wrote in his report and testified at his deposition that he went with Officer Hawkins to the scene at the same time together. (See Calderone transcript Ex. at 38:13-20; 39:11-24; 40:1-4). Officer Calderone then claims that he radioed for back-up and Officer Firnstein and Officer Kelly arrived shortly afterwards. However, Officer Hawkins specifically remembers that Officer Hawkins and Officer Kelly were already at the scene when he pulled up. (See attached hereto Officer Hawkins Transcript as Ex. Q

at 11:8-24; 12:8-10.). In addition, Officer Calderone claims that the Plaintiff jumped at him and the Officer Hawkins stopped the Plaintiff. (See Officer Calderone Ex. at 45:16-24; 46:1-12.) Officer Hawkins, however, testified that he was not needed and never touched the Plaintiff. (See Hawkins Ex. Q at 24:20-24.) Once again, Officer Calderone's veracity is called into question and any assertions he has made in the police report and at his deposition are called into question.

## I. GENERAL BACKGROUND

1. In December 2008, the Plaintiff made a complaint to Lt. Robert Sheets about an incident involving a former neighbor, Richard McCusker, and two police officers that responded to the incident.
2. Lt. Sheets refused to accept his complaint.
3. Immediately after seeing Lt. Sheets, the Plaintiff went to the Internal Affairs Department for the Boston Police to file his complaint. Again, the Plaintiff's complaint was refused.
4. On March 25, 2009, Ramon Benzan ("Benzan"), who was working as a subcontractor for the Plaintiff requested to be taken to the train station and that he had to get back to New York City as soon as possible.
5. The Plaintiff obliged.
6. At the station, Benzan demanded cash – not check, even though the Plaintiff had always paid Benzan by check in the past.
7. The Plaintiff left Benzan at the Forest Hills Train Station, drove a couple miles down to Roslindale Square to get some money out of the ATM machine, and returned to pay Benzan. The Plaintiff arrived back at the train station just before 10:30 a.m.
8. Benzan demanded more money than he was owed so Plaintiff left and returned back to the house he was developing.
9. Video from the Massachusetts Bay Transit Authority ("MBTA") reveals that Benzan entered the train station around 10:35 a.m., spoke to a Customer Service Attendant

(("CSA"), Edwin Rosario ("Rosario"), and that Benzan did not leave the Forest Hills station until one minute before 11:00 a.m.

10. In the video, Benzan does not appear nervous or sweating.
11. Then, at 11:12 a.m., the Plaintiff received a telephone call from Officer Bradley at the E-5 West Roxbury Police Station. The E-5 station is more than 3 miles away from Forest Hills station – the E-13 Police Station is only a mile from Forest Hills station. The trip from Forest Hills station to the E-5 station at that time of the day would take close to 8-10 minutes depending upon traffic.
12. Officer Bradley told the Plaintiff that she had a Ramon Benzan ("Benzan") down at the station and that he claimed he worked for the Plaintiff and that the Plaintiff had pulled a gun on him.
13. Benzan's cell records reveal that he never called 911.
14. The Plaintiff told Officer Bradley that he didn't own a gun and that if they wanted to come down to the house to talk about it they could.
15. A half hour later at 11:42, Officers Calderone and others were dispatched to the house the Plaintiff was developing located at 186 Walter Street, Roslindale, Massachusetts.
16. According to Lt. Sheets, he ordered Officers Calderone and Officer Hawkins down to investigate.
17. Officer Calderone claims that he went to the location with Officer Hawkins. However, Officer Hawkins testified that he definitely came after the other officers were already at the scene.
18. Officer Bradley and Officer Calderone both testified that they did not have probable cause to arrest the Plaintiff based upon Benzan's statements at the police station.
19. Around 11:45 a.m., the Plaintiff left the house at 186 Ashfield Street and as he was coming out the door several police officers started coming towards him.
20. Three of the officers, Officer Calderone, Firnstein, and Kelly, surrounded the Plaintiff.
21. Officer Hawkins was also present but he was to the back-side of the Plaintiff.
22. Officer Calderone demanded to know "what's going on" in an aggressive manner.
23. The Plaintiff told him nothing was going on.

24. This exchange of "what's going on?" and "nothing is going on" continued for about four individual exchanges.
25. Finally, Officer Calderone demanded the Plaintiff's license and the Plaintiff complied.
26. Officer Calderone again demanded to know "what's going on?"
27. The Plaintiff asked for his license back and then was placed under arrest.
28. Officer Calderone testified that the exchange between he and the Plaintiff lasted no more than a minute to a minute and a half.
29. Officer Calderone claimed, inter alia, that the Plaintiff was hostile, yelling, lunging at him, moving side to side, and jumped 2 to 3 feet at him causing Officer Hawkins to grab the Plaintiff.
30. An eyewitness to the exchange between Officer Calderone and the Plaintiff, John Higgins, testified that it lasted about one to two minutes and that it was "peaceful" and the Plaintiff never moved. (See attached hereto John Higgins Transcript as Ex. S at 8:12-20; 9:5)
31. Officer Hawkins testified that he never had to get involved and that the other officers had it under control.
32. Officer Hawkins testified that he never touched the Plaintiff.

    Officer Firnstein testified that the Plaintiff was "combative". When asked how he was combative, Firnstein said the Plaintiff was "uncooperative". When asked how the Plaintiff was uncooperative, Firnstein said he could not remember.
33. After the Plaintiff was brought to the station, Officer Calderone yelled to the Plaintiff that "you're a lawyer, you should know better than to not cooperate with the Boston Police."
34. A few months after the Plaintiff's arrest, the Plaintiff's wife went down to the E-5 police station to inquire about why the police had put a ticket that said to move the vehicle on the Plaintiff's dad's truck.
35. At the station, Officer Calderone realized, after pulling up her father-in-law's license plate number, that the Plaintiff was her husband. The Plaintiff's wife has a different last name.

36. Officer Calderone told the Plaintiff's wife to tell the Plaintiff to just get a friend to represent him and to not pay a lawyer. He told her that they had no case – they had no gun.
37. Approximately 5 months after arraignment, ADA Pagliarulo decided to nol pros the case after he met with Benzan. See Attorney Bennett e-mails attached hereto as Ex. F.
38. He told the Plaintiff's attorney, Todd Bennett, that before he did he wanted to speak with the arresting officer as a matter of protocol.
39. ADA Pagliarulo told Attorney Bennett that Officer Calderone never spoke with the alleged victim and that a Detective Wightman who spoke with Benzan never believed his story.
40. Interestingly, Officer Calderone, denied that he told ADA the he never spoke with Benzan and he claims he told ADA Pagliarulo he wanted to prosecute the Plaintiff.
41. In addition, Officer Calderone testified that ADA Pagliarulo told him that the Plaintiff was an attorney and that he was well known in the courthouse – inferring that the Plaintiff was somehow given some special treatment.

## II. ARGUMENT

### A. The Defendant Police Officers Did Not Have Probable Cause To Arrest The Plaintiff Where The Alleged Victim Was Not Reliable And A Prudent Officer Would Not Have Believed The Plaintiff Committed The Offense Of Assault With A Deadly Weapon.

"A police officer has probable cause when, at the time of the arrest, the "facts and circumstances within the officer's knowledge ... are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." In determining whether the officer had probable cause, we must view the circumstances from the perspective of a reasonable person in the position of the officer. Probable cause requires

only a probability that the defendant committed the crime. ("But sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment and on the record before us the officers' mistake was understandable and the arrest a reasonable response to the situation facing them at the time."); ("Probable cause [to arrest] exists if there is a fair probability that the person committed the crime at issue." "The test for probable cause does not require the officers' conclusion to be ironclad, or even highly probable. Their conclusion that probable cause exists need only be reasonable." Holder v. Town Of Sandown, 585 F.3d 500, 504 (1st Cir. 2009) (internal citations omitted)

"The question of probable cause, like the question of reasonable suspicion, is an objective inquiry. The "actual motive or thought process of the officer is not plumbed." The only relevant facts are those known to the officer. When these facts are in reasonable dispute, the fact-finder must resolve the dispute. However, when the underlying facts claimed to support probable cause are not in dispute, whether those "raw facts" constitute probable cause is an issue of law that we must determine de novo." Holder, 585 F.3d at 504 (1st Cir. 2009) (internal citations omitted).

Probable cause to arrest the Plaintiff did not exist under any scenario as proffered by the Defendants as outlined below.

**1. Probable Cause Determination Applying Facts Contained In Police Report.**

According to the police report, the alleged victim walked into the police station and made claims about an alleged employer pulling a gun on him. Benzan described the man who assaulted him as being a guy named "Pat" that he had worked for a couple years and was working in the vicinity of Weld and Walter Streets. He did not provide any last name for the person. Benzan claimed he had a dispute over money with the

employer and that he threw the money back at him because he was unsatisfied with the amount. Benzan claimed the alleged suspect told him to get the "Fuck" away from him and pointed a long barreled black hand gun at him – then fled. The testimony of several of the officers contradicts one another as previously discussed with respect to what Benzan allegedly told police. This fact it important to the determination of whether or not there are material facts in dispute and whether or not the Defendants had probable cause to arrest the Plaintiff with facts "known" at the time as reported in the police report. As demonstrated above, Officer Calderone's averments in his police report, his interrogatories and at his deposition are not credible. Officer Calderone's testimony and police report go to the heart of whether or not Benzan was credible and whether or not the facts as represented by Officer Calderone have any truth to them. The Plaintiff asserts that Officer Calderone's statements cannot be believed.

That being said, the alleged victim himself was not a credible complainant and the police did not have probable cause to arrest the Plaintiff based upon the facts recited in the police report. Some of the factors to be considered by the court in making its determination of whether there was probable cause to arrest are the alleged actions and inaction of Benzan as outlined above and the following factors:

- Benzan did not call 911 (See Benzan cell records attached hereto as Ex. R)
- Benzan did not report a claim of Plaintiff pulling a gun on him to the MBTA Transit Police even thought the alleged incident was to have occurred in broad daylight in front of Forest Hills Station (note: location of incident on Police Report is Forest Hills)
- Benzan did not go to the nearest police station, E-13 Jamaica Plain, despite this alleged serious threat by the Plaintiff
- Benzan allegedly claimed he was homeless (in reality lived in New York)
- Benzan allegedly did not know the Plaintiff's last name even though he had subcontracted for work for a couple years (he was also always paid by check)

All these factors coupled with the lies by Officer Calderone demonstrate that no probable cause existed to arrest the Plaintiff.

**2. Officers Calderone, Bradley, and Lt. Sheets Did Not Believe Probable Cause Existed Based Upon Benzan's Story.**

It is clear that both Lt. Sheets and Officer Bradley did not believe Benzan's story and that there where credibility issues with respect to Benzan where both of these officers testified that further investigation was necessary and Officer Bradley testified that probable cause did not exist at the station. Significantly, the officer who made the decision to arrest the Plaintiff, Officer Calderone, testified that probable cause did not exist based upon Benzan's statements to the police at the E-5 station. Moreover, Detective Wightman never believed Benzan's story as previously outlined above.

If the police had probable cause based upon Benzan's complaint, there would have been no further duty to investigate. Significantly, Officer Bradley, who did not believe there was probable cause to arrest at the station, called the Plaintiff to ask him about Benzan's allegation. Again, as discussed previously, it makes no sense why Officer Bradley would call the Plaintiff to alert him about the complaint if they truly thought Benzan's story was credible.

**3. Even Under The Defendants' Newly Asserted Statements By Benzan, Probable Cause To Arrest The Plaintiff Did Not Exist.**

Assuming arguendo that Benzan made claims as recently averred by the Boston Police Officers, there still was no probable cause to arrest the Plaintiff. These additional statements that the officers now claim Benzan made are as follows:

- Benzan allegedly claimed he was Illegal (in reality was legal permanent resident)
- Benzan allegedly claimed he was wanted in New York (Benzan had no outstanding warrants in New York)
- Benzan allegedly did not know the Plaintiff's last name but then did know his last name
- Benzan allegedly claimed he worked "under the table" (in reality the Plaintiff paid Benzan by check)
- Benzan claimed he did not trust the police – yet, he went to the police to make a complaint

Even if the court were to accept these additional "statements" by Benzan, the police still did not have probable cause to arrest the Plaintiff. The police now claim that they did not investigate Benzan's claims of being an illegal immigrant, being wanted in New York, and working "under the table". All of these factors demonstrate that the police acted, at minimum, in a reckless manner and violated the Plaintiff's civil rights when they arrested him based upon a claim by an unreliable complainant that failed to call 911, yet came into the E-5 police station to make a complaint while he was supposedly "wanted" in New York and illegal. The story makes no sense.

## III. CONCLUSION.

Under all scenarios as represented above, the police did not have probable cause to arrest the Plaintiff and that is why this court should find in the Plaintiff's favor. To find otherwise would virtually eliminate any claim of false arrest under §1983 causing it to become a fictional claim.

Further, for the above reasons stated, the Plaintiff respectfully terminates Attorney Max Volterra as counsel of record. Plaintiff further respectfully requests that this court

strike the "undisputed facts" from the Pre-Trial Memorandum as requested by the Plaintiff on several occasions. Finally, the Plaintiff respectfully requests that the court find that the defendant police officers in this action did not have probable cause to arrest as a matter of law. In the alternative, the Plaintiff respectfully requests that the court find there are sufficient material facts in dispute and set a trial.

SIGNED UNDER THE PAINS AND PENATIES OF PERJURY THIS 22ND DAY OF December 22, 2013 AS A VERIFIED MOTION.

Respectfully Submitted
By the Plaintiff

/s/ Patrick Michaud

Patrick Michaud BBO# 632154
649 Massachusetts Avenue, Suite #6
Cambridge, MA 02139
(617) 999-6027 (tel)
(617) 934-1669 (fax)
pmichaud@michaudlawfirm.com

Certificate of Service

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the NEF (NEF) and paper copies will be sent to those indicated as non registered participants on December 23, 2013.